**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANTONIO PECK, a minor, by and through**
**his parents and next friends, JO ANNE PECK**
**and KENLEY LESTER PECK,**

**Plaintiff,**

**v.**

**99-CV-1847**

**BALDWINSVILLE CENTRAL SCHOOL DISTRICT,**
**CATHERINE MCNAMARA ELEMENTARY SCHOOL,**
**ROBERT CREME, individually and in his official capacity**
**as Principal of Catherine McNamara Elementary School,**
**and THEODORE GILKEY, individually and in his official**
**capacity as Superintendent for Baldwinsville Central School**
**District,**

**Defendants.**

_____

**APPEARANCES:**

LIBERTY COUNSEL
Mathew D. Staver, Esq., of counsel
1900 Summit Tower Blvd., Ste. 540
Orlando, Florida 32810
Attorneys for Plaintiff

BOND, SCHOENECK & KING, LLP
Louis Orbach, Esq., of counsel
Office & P.O. Address:
One Lincoln Center
Syracuse, New York 13202
Attorneys for Defendants

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.       BACKGROUND**

Jo Anne Peck and Kenley Lester Peck brought this action on behalf of Antonio Peck

("Antonio"), a kindergarten student at the time of the events in question, against Baldwinsville

Central School District ("District"), Catherine McNamara Elementary School ("School"), the

School's Principal Robert Creme and the District's Superintendent Theodore Gilkey (collectively

"defendants").  In the complaint, Antonio challenges defendants' conduct with respect to two

posters he prepared in response to an assignment.  Defendants rejected the first poster, which

contained religious images, and displayed the second poster with a portion folded under so as to

conceal a religious image.  Antonio claims that defendants' actions infringed his First

Amendment right to freedom of speech and religion, denied him equal protection of the law, and

violated the Establishment Clause.

Defendants moved to dismiss the complaint on the ground that it failed to state a claim

upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  By Memorandum Decision and Order

dated February 15, 2000, this Court converted defendants' Rule 12(b)(6) motion into a Rule 56(b)

motion, and granted summary judgment on all counts in favor of defendants.  *See Peck v.*

*Baldwinsville Cent. School Dist.*, 2000 U.S. Dist. LEXIS 13362 (N.D.N.Y. 2000).

Plaintiff appealed the decision and on March 28, 2001, the Second Circuit vacated the

judgment and remanded the case for discovery.  *Peck v. Baldwinsville Cent. School Dist.*, 7

Fed.Appx. 74, 75-76, 2001 WL 303755, *2 (2d Cir. 2001).  After plaintiff concluded discovery

defendants moved for summary judgment.  By Memorandum Decision and Order dated August

16, 2004, this Court granted defendants' motion and dismissed the action in its entirety.  Dkt. No.

77.

Plaintiff appealed the decision and on October 18, 2005, the Second Circuit affirmed the

Court's dismissal of plaintiff's Establishment Clause claim but vacated and remanded plaintiff's

2

free speech claim.  *Peck v. Baldwinsville Cent. School Dist*., 426 F.3d 617 (2d Cir. 2005).

On January 29, 2007, the Court held a bench trial to resolve the following questions:

1. Did plaintiff prove by a preponderance of the evidence that the direct cause of the decision to display plaintiff's second poster with the image of Jesus folded under was (a) an official policy of the Board of Education, or (b) a school district custom so permanent, widespread and well-settled as to constitute the equivalent of an official policy of the Board of Education of the Baldwinsville Central School District?

2. Did plaintiff prove by a preponderance of the evidence that Antonio's poster conveyed a religious viewpoint on the topic of how to save the environment?

3. Did plaintiff prove by a preponderance of the evidence that the poster would not have been similarly treated if it had depicted a purely secular image that was equally outside the scope of Ms. Weichert's environmental lessons and non-responsive to the assignment?

Following the one-day bench trial, the parties submitted proposed findings of fact and conclusions of law.  Dkt. Nos. 124, 125.  The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52.

## II.    FINDINGS OF FACT

At trial, Mrs. Peck, Mrs. Weichert, and Principal Creme testified.  Superintendent Gilkey, was not available for trial; accordingly the parties introduced portions of his deposition testimony.[1]  Antonio was a kindergarten student during the 1999-2000 school year at Catherine McNamara Elementary School in the Baldwinsville Central School District.  Dkt. No. 104, p.2. Beginning in September and continuing until June, Dkt. No. 120, Bench Trial Transcript, p.48

---

[1]Defendants object to the introduction of certain portions of Superintendent Gilkey's deposition testimony.  The Court has considered those objections and sets forth the designated portions of his testimony which it finds relevant to the disposition of this case.  To the extent defendants object based on form, without further explanation, those objections are overruled. Defendants' objections to the designations of Superintendent Gilkey's answers, without also incorporating the preceding questions are sustained, and the Court incorporates the preceding questions.

3

("T.48"), Antonio's teacher, Susan Weichert, taught an environmental curriculum which addressed ways to take care of the earth, and how the students could find ways to help the earth. T.98.  Mrs. Weichert explained that they "had a big push about turning off the lights when we left the classroom to save energy, turning off the water to save the water, help take care of our environment by picking up the trash".  T.45.  Recycling at home and in school was also part of the environmental curriculum.  T.98-99.  At the end of the school year, the School held a kindergarten environmental program, during which the kindergarten students would sing environmental songs and the environmental posters they prepared would be displayed.  T.41.

The kindergarten teachers assigned the students to do posters for the environmental program in order to assess the students and obtain "an overview of what the child had learned throughout the year on ways that he [or she] could care for the earth".  T.99.  The posters were "mainly for the parents to look at and for the children to have an opportunity to show their understanding of ways that they can help the earth."  T.82.  Mrs. Weichert instructed the children that the poster should show what they learned in class.  T.100.  Mrs. Weichert also sent a letter addressed to parents explaining, in relevant part:

> We are writing to inform you about our environmental program that we will be presenting to the parents on June 11th.... Please try to attend, the children are very excited about this program and will spend a lot of time preparing for it. In previous years, as part of our environmental program and as a culminating activity, we will plant a tree on the school grounds. To raise funds to purchase this tree, we have asked the children to bring in returnable cans. We will start collecting cans immediately. We appreciate your involvement in this project.

> To enhance the student's understanding of his environment, we are asking students to make an environmental poster at home and bring it to school by June 4th. These posters will be on display at our program. The children may use pictures or words, drawn or cut out of magazines or computer drawn by the children depicting ways to save our environment, i.e. pictures of the earth, water, recycling, trash, trees etc. This

should be done by the student with your assistance.  The poster should be able to fit in the child's backpack.  We hope this project will be fun for all!

Plaintiff's Ex. 1.  Mrs. Weichert sent home a second letter to parents announcing a time change in the environmental program, it also reminded parents "that each student should be working on his environmental poster to be hung up at the Program.  Ideas should involve ways to save Earth and it should be the child's work.  Pictures drawn, cut out of magazines, or computer drawn are all great ideas."  Plaintiff's Ex. 2; T. 44.

### A.      First Poster[2]

Antonio brought both these letters home in his backpack and Mrs. Peck read them.  T.15. She understood that "Antonio was to do a poster on how to save the environment.  It had to be the child's original ideas.  There could be help from the parents, but that they wanted it mainly the child's idea."  *Id*.  Mrs. Peck sat down with Antonio and "got out books . . . magazines and stuff for Antonio to do, and he cut out stuff from magazines and he did a poster."  *Id*.  According to Mrs. Peck, Antonio selected the pictures cut them out, and put them on the poster himself.  T.16.  Antonio also conveyed to Mrs. Peck that "he wanted it to say, the only way to save our world" which Mrs. Peck wrote down on a piece of paper, and Antonio signed his name on the bottom.  *Id*.  Mrs. Peck believed the poster was intended to convey "environmental, how to save the earth, recycling stuff and just what they had been learning.  And that's what Antonio said, that the only way to save the earth was through Jesus, and he picked the picture and put them on" the first poster.  T.17.

Across the top of the first poster were the words "the only way to save our world!"

---

[2]Plaintiff does not, at this point, raise any claims with respect to the first poster.

Plaintiff's Ex. 3.  The poster contained cut-out pictures which had been attached to the paper.  *Id.*
The pictures included: a bearded man kneeling with clasped hands and eyes closed in prayer; a
picture of a soldier with the words "The Armor of God"; a picture of a woman carrying fruit with
the words "The Fruit of the Spirit"; a picture of a bearded man carrying two stone tablets with the
words "The Ten Commandments"; a picture entitled "My God's World", with pictures of a girl,
house, Bible, Jesus, family, church, God and heaven; a picture of Jesus walking with a little boy
with the words "Jesus Loves the Children"; a picture of a choir singing with the words "Jesus
loves me this I know, for the Bible tells me so . . ."; a picture of the sun on the horizon with the
words "In the beginning God created the heavens and the earth; a picture of a scroll with the Ten
Commandments; a picture of a boy and a girl; a picture of a rainbow with the words "God keeps
his promises"; and pieces of paper with the words "Prayer Changes Things" and "God's love is
higher than the heavens".  *Id.*  The poster also had a large picture of Jesus, kneeling with arms
raised next to the words "Seek to Find Jesus".  *Id.*

When Mrs. Weichert received Antonio's first poster, she "looked at it and thought I've
been teaching environmental conservation . . . from September, and this poster doesn't talk about
anything that I've been teaching for the last almost ten months."  T.48.  Mrs. Weichert took the
poster to Principal Creme, "to ask his advice on what I should do with this poster."  *Id.*  She was
"concerned that it didn't have anything to do with what I had been teaching since September."
T.49.  Mrs. Weichert explained that "[i]t was clearly a religious poster with religious overtones.  I
hadn't taught any of those things, so I felt that I needed a poster from Antonio that reflected what
he had been learning in kindergarten."  T.50.

Principal Creme discussed the first poster with Mrs. Weichert and was concerned because

6

he "didn't think that it was something that Antonio had been truly responsible for." T.107.

Principal Creme explained that he "had known of Antonio's progress and capabilities throughout

the school year. I also knew what the unit of instruction was that had taken place, and I didn't see

any way for Antonio to make the leap from that unit of instruction to this topic." T.108.

Principal Creme telephoned Baldwinsville Central School District Superintendent Theodore

Gilkey to ask if the poster "should be handled in the same way as things that were submitted that

were obviously not the work of the student that supposedly submitted them." *Id*. Superintendent

Gilkey said yes. T.109.

Superintendent Gilkey stated that the practice of the District when there is "a situation

where a teacher has a concern with any activity in the classroom . . . they bring it to the attention

of the building principal." Gilkey Deposition Transcript, p.14. At that point, the building

principal "has to make a decision. And if the building principal doesn't feel that he or she can

make the appropriate decision, then they would contact either . . . myself or the assistant

superintendent." Dep., p.16.

Superintendent Gilkey stated that he received a call from Principal Creme at some point,

he assumed, after Antonio turned in his first poster. Dep., p.37. Superintendent Gilkey told

Principal Creme that he had no problem with asking Antonio to redo the poster because it did not

"reflect the assignment that was given", *id*., or the "instruction that took place in the class". Dep.,

p.38.

Mrs. Peck testified that Mrs. Weichert informed her that Antonio had to do another poster

"because of its religious content and she thought that she would get in trouble if she hung this

poster." T.17. Mrs. Peck stated that she then spoke with Principal Creme who told her that the

7

poster:

> had too much religious stuff in it. Had it showed what he had learned through recycling, different environmental things, you know, kids throwing things in trash and stuff, that he would allow some of the religion, just that it needed to show what he had learned and so we did complete a second poster.

T.18. Mrs. Peck testified that Principal Creme told her that the second poster could have "a little bit of religious stuff, but more like kids throwing things in trash, kids circling the world . . . environmental stuff for . . . what they had learned over the past six weeks." *Id.*

### B.   Second Poster

According to Mrs. Peck, Antonio completed a second poster by taking some "coloring pages out of magazines", using some recycling pictures from the computer, and incorporating a picture of Jesus and his original idea that "Jesus saved the earth and that he had something to do with the environmental part of the poster." T.19, 20-21. Antonio completed the second poster himself, and wrote his name on it. T.21.

In the center of the second poster is a church with three crosses on it as well as a picture, in one of the windows, of a boat - an ark. Plaintiff's Ex. 4. There is a tree on each side of the church and four mice around the church and the trees. *Id.* There are two children in front of the church throwing garbage into two trash cans. *Id.* There are pictures of clouds in the sky. *Id.* In the upper right of the poster, there is a picture of a globe with children holding hands around it. *Id.* In the lower right, there is a picture of two people recycling. *Id.* On the left, is the same large picture of Jesus kneeling with hands lifted upwards as was on the first poster. *Id.*

Mrs. Weichert explained that before the posters were hung in the cafeteria for the program, "each child got an opportunity to explain to the class ways that they were going to help the earth." T.51. When Mrs. Weichert asked Antonio to explain his poster, he "talked about the

little children throwing trash in the bucket". T.66-67. Antonio did not specifically talk about the kneeling figure, so Mrs. Weichert "asked him just like I would anybody else if there were a portion that they didn't speak to, Antonio, there is another picture on this poster, would you like to talk about it, and Antonio didn't have anything to say about the other picture." T.66.

According to Mrs. Weichert, the pictures on Antonio's second poster of people recycling, the children circling the globe, children picking up trash and putting it in the garbage, and the trees were all consistent with her class instruction. T.51-52. Mrs. Weichert, however went back to Principal Creme because although she "felt that three-quarters of the poster did depict ideas that had been taught in class since September . . . the kneeling figure . . . wasn't relevant to what I had taught in kindergarten" because she did not "teach religion in kindergarten." T.53. Mrs. Weichert testified that the kneeling figure was "clearly religious." T.54.

Mrs. Weichert and Principal Creme "agreed that the poster should be hung, and we agreed that the portion we could just fold under because it didn't have anything to do with what . . . I had taught." *Id*.[3] In doing so, it was Mrs. Weichert's "intent to show the portion of the poster that, in fact, dealt with what I had been teaching since September." *Id*. Mrs. Weichert further explained that she also folded the picture of Jesus because she "felt that other parents could look at this poster and think, and make the leap that I was, in fact teaching religion in the classroom, which I was not." T.60. Principal Creme testified that the second poster was folded "because it contained a part of the first poster which was not the student's work." T.173. There were approximately 80 posters displayed during the environmental program. T.25.

On June 11, 1999, when Mrs. Peck arrived at the environmental show she saw that

---

[3]Principal Creme did not recall seeing Antonio's poster prior to the program. T.114.

Antonio's poster was displayed, but had been folded in half [4] "so that you couldn't see the side where Jesus was". T.21, T.24. When she got home from the program, Mrs. Peck called Principal Creme and asked why Antonio's poster was folded. T.26. Mrs. Peck stated that Principal Creme told her it was folded "for the same reasons that he had told me with the other one, that the religious content." T.27. Subsequently, Mrs. Peck spoke with Superintendent Gilkey to ask whether there were "any written policies on children's art work with religious aspect in schools." *Id*. Superintendent Gilkey responded that there was not but it was up to the individual school principal. *Id*.

Superintendent Gilkey testified that it was his understanding that the second poster was folded in half was because:

> Mr. Creme or Mrs. Weichert had a concern, number one, that the poster was not responsive to the assignment, a portion of the poster was not responsive to the assignment. And secondly, they were concerned that by displaying the poster they would communicate to the people at the activity that the school was endorsing religion, or Jesus.

Dep., p.44. Although Superintendent Gilkey learned of the decision afterward, Dep., p.45, and did not attend the environmental program, Dep., p.47, he approved of the decision to fold the poster in half. Dep., p.44.

Superintendent Gilkey had a conversation with Mrs. Peck, at some point, about whether the District had a policy regarding the display of posters. Dep., p.73. Superintendent Gilkey told her that it did not. *Id*. Superintendent Gilkey also discussed this case with the Board of Education sometime after he "became aware of the concerns" that arose from the program. Dep.,

---

[4]Mrs. Weichert and Principal Creme intended that the poster be folded to conceal the image of Jesus, only. There is no evidence that the folding of the poster in half was anything but inadvertent.

p.90.  He informed them that there were "concerns" and that there might be "some legal action." Dep., p.91.  Superintendent Gilkey explained to the Board that he had spoken with Principal Creme and learned that "a portion of the poster had been folded over . . . so that the figure of Jesus was not displayed.  And that the reason he did that was that it was not responsive to the assignment and that he thought it could be interpreted as the school supporting or endorsing religion."  *Id.*

## C.      Motivations for Censoring the Second Poster

At this stage, the relevant inquiry centers on whether defendants censored Antonio's poster because it was non-responsive, or because it offered a religious perspective on the topic of how to save the environment.  Accordingly, at trial, plaintiff's counsel extensively questioned Mrs. Weichert and Principal Creme regarding their motivations for folding over the image of Jesus on Antonio's poster.  Mrs. Weichert testified that she folded the image of Jesus over on Antonio's poster because: (1) "it didn't have anything to do with what [she] had been teaching since September"; T.60, (2) Antonio did not explain it; T.84, (3) she did not believe Antonio could explain the relationship between the image of Jesus and saving the environment; T.88, and (4) she "felt that other parents could look at this poster and . . . make the leap that I was, in fact teaching religion in the classroom, which I was not."  T.60.

Principal Creme testified that because the first and second posters both contained the same image of Jesus, and since he did not think the first poster was Antonio's work, he did not think that the image of Jesus on the second poster was Antonio's work, either.  T.118.  Principal Creme explained that the "level of thinking that would be required to . . ." "move from concrete examples of ways to preserve the environment to something that is . . . very abstract" and would

11

have been "beyond Antonio's ability at the time."  T.123.  Principal Creme testified that looking at the second poster "now" he would also "believe that some people would have felt that we were teaching religion" if the Jesus image had been displayed.  T.130.

At trial, plaintiff's counsel asked Mrs. Weichert questions regarding her hypothetical response to posters that, instead of an image of Jesus, contained a manatee, the Sierra Club logo, atoms, or Smokey the Bear, images which, like Jesus, she did not specifically discuss in class. Mrs. Weichert stated that had a student put a manatee on his or her poster, she would have "seen and listened to what he had to say when he explained the poster to the class.  I wouldn't have done it on an individual basis or apart from the class, he would have done it in front of the class." T. 57.  Mrs. Weichert testified at trial that she did not know whether she would have allowed the poster to be displayed if the student did not explain the manatee, *id.*, but acknowledged that during her deposition she stated that she "probably wouldn't have folded it over because I can't imagine that there would have been any parent that would have objected to a manatee because they wouldn't have construed it as anything other than an animal."  T.59.  Mrs. Weichert testified at trial that although they did not discuss endangered species in class, they did talk "about animals and why we were taking care of the earth, to help the people as well as the animals."  T.56.

When asked what she would do if a student put the Sierra Club logo on his or her poster, Mrs. Weichert responded:

> I guess my best answer to that would be that the Sierra Club has to do with environmental.  Do I think the child would understand or would have come up with that on his own?  No.  I think that would have been something that would have come straight from the parents.  Because it still had an environmental theme, probably would have allowed it.  Again, I would wait to see what the student had to say when he presented it to the class.

T.61.

Principal Creme was also asked about the presence of a Sierra Club logo instead of the image of Jesus, and whether that would have been permitted if the student explained it.  T.130. Principal Creme responded:

> No.  I think I would have believed that that's something that somebody other than a child did come up with.  We're talking about kindergarten students.  Sierra logo in connection with what was taught in this unit would not have been something that would have come across the mind of a child that age.

T.130.  Principal Creme further stated that he would leave the determination of whether a student could explain the relationship between the Sierra Club and the environment to the kindergarten teacher.  T.134.

Next, plaintiff's counsel asked Mrs. Weichert how she would respond if a student put some pictures of atoms instead of Jesus on his poster.  T.63.  Mrs. Weichert could not imagine how a five-year-old could come up with atoms, but stated that  "[i]f the student could explain it to me and it was related to the environment and he could relate how those atoms were going to help the earth and help him take care of the earth, then I would have allowed it."  *Id*.  Mrs. Weichert further explained that if the student's explanation "had been responsive to what I had taught, not the atoms per se, but if he could explain to me how that related to what he had been learning since September, then yes, I would have accepted it."  T.64.

Finally, plaintiff's counsel asked Mrs. Weichert how she would approach the situation if there were a picture of Smokey the Bear, instead of Jesus, on Antonio's poster.  *Id*.  Mrs. Weichert responded, that she:

> would approach in the same way I had approached all the posters; the child would have an opportunity to explain it to the class and I would listen to hear what the child had to say.  If he could relate why Smokey the Bear was there in relation to what he had learned in the classroom since September, then I would have accepted it.

13

T.65.

After discussing these images with Mrs. Weichert, plaintiff's counsel asked how she would have responded if Antonio:

> told you that this picture of Jesus was his way of expressing how to save the world and that Jesus was important to saving the world, even though he gave you that explanation, you would not post it because of the concern of people thinking that you were teaching religion?

T.88.  Mrs. Weichert testified that:

> The whole idea of the children making these posters was to show me what they had learned from September through June on ways that they could help the environment. I guess I'm a little vague on how he could have possibly explained how he felt that he directly could take care of the earth - - I don't know.  It's difficult to answer this question without knowing, without speculating on what Antonio would say about this figure.

*Id*.

Principal Creme testified that with regard to the picture of Jesus on Antonio's poster, it was his "assumption . . . that what's there was not Antonio's thought process and not his - - he didn't relate that to the assignment that was given, not on his own."  T.122.  Principal Creme explained that "the level of thinking that would be required to make that leap was something that was beyond Antonio's ability at that time."  T.123.  More specifically, "he is moving from concrete examples of ways to preserve the environment to something that is not at all concrete, is very abstract."  *Id*.  Finally, Principal Creme testified that he could not say whether, if Antonio had explained why the image of Jesus was on his poster, it would have been displayed because "[i]t's not something that Antonio would have been capable of doing at this time him his life."  T.174.

## III.     PROCEEDINGS BEFORE THE SECOND CIRCUIT

14

As stated, after the Court granted summary judgment for defendants in this case, plaintiff appealed to the Second Circuit.  The Second Circuit reversed the Court's entry of summary judgment on plaintiff's free speech claim and remanded it for further proceedings.  In doing so, the Second Circuit first considered "what sort of forum had been created for the environmental poster assignment" since, it explained, "the level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs." *Peck,* 426 F.3d at 626.

The Second Circuit found the undisputed facts in this case showed that the School facilities, including Antonio's classroom and the School cafeteria, were a non-public forum.  *See Peck*, 426 F.3d at 626-27.  A non-public forum is "neither traditionally open to public expression nor designated for such expression by the State." *Id*. At 626.  In such a forum, the government may exclude a speaker "if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created".  *Cornelius v. NAACP Legal Defense and Educational Fund, Inc*., 473 U.S. 788, 806 (1985) (internal citation omitted).  However, the government violates the First Amendment when it excludes a speaker "solely to suppress the point of view he espouses on an otherwise includible subject." *Id*.

The Second Circuit next addressed the "nature of-and level of constitutional protection to be accorded to-the student expression represented by Antonio's poster", *Peck*, 426 F.3d at 627. In this regard, the Second Circuit concluded that Antonio's poster was school-sponsored speech and fell within the framework of *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271 (1988).  *Id*. at 628.  In *Hazelwood*, the Supreme Court held that "educators do not offend the First

Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273.

Here, the Second Circuit found that because the undisputed facts showed that in addition to being displayed at a school-sponsored assembly, "the poster was prepared by Antonio pursuant to a class assignment, and one that was given under highly specific parameters: to 'depict[ ] ways to save our environment' and to reflect what had been taught in the kindergarten environment unit" *Peck*, 426 F.3d at 628, the poster was school-sponsored speech. *Id*. at 629 (the poster and environmental assembly "were indisputably 'part of the school curriculum . . . . supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.'") (quoting *Hazelwood*, 484 U.S. at 271).

The Second Circuit then turned to the question of "whether the record demonstrates triable issues as to whether The District's reasons for censoring Antonio's poster are, in the language of *Hazelwood*, 'reasonably related to legitimate pedagogical concerns.'" *Id*. On appeal, the parties agreed that the "pedagogical concerns" that motivated the District to censor Antonio's poster were:

> a) that the portion of Antonio's poster depicting the robed figure was not responsive to the assignment; b) that the placement of that image on the poster was not Antonio's own work; and c) that showing the image risked creating the impression that the kindergarten environmental unit had included the teaching of religion.

*Peck*, 426 F.3d at 629-630. The Second Circuit noted that "[u]nquestionably" these pedagogical concerns pertained to legitimate interests. *Id*. at 630, n.8. More specifically, the Second Circuit found that the undisputed facts showed that Mrs. Weichert and Principal Creme "made a reasonable determination that JoAnne Peck (and not Antonio) was responsible for the poster's

16

content," and thus that the second "pedagogical concern" did not implicate the First Amendment. *Id.* at 630. The Second Circuit then addressed this Court's conclusion that "there were no triable issues as to whether The District had engaged in viewpoint discrimination . . . because . . . the robed figure shown on Antonio's poster was unquestionably beyond the scope of the poster assignment". *Id.* On this score, the Second Circuit found that there were fact questions which raised an issue as to the "viewpoint neutrality of The District's decision with respect to Antonio's poster." *Id.* The Second Circuit explained that:

> In our judgment, however, the district court overlooked evidence that, if construed in the light most favorable to the Pecks, suggested that Antonio's poster was censored *not* because it was unresponsive to the assignment, and not because Weichert and Creme believed that JoAnne Peck rather than Antonio was responsible for the poster's content, but because it offered a religious perspective on the topic of how to save the environment.

*Id.* at 630.

Specifically, while recognizing the difficulty of drawing a line between content discrimination and viewpoint discrimination, the Second Circuit found disputed factual questions "as to whether Antonio's poster offered a 'religious viewpoint' and whether, if the poster had depicted a purely secular image that was equally outside the scope of Weichert's environmental lessons, it would similarly have been censored." *Id.* at 631. The Second Circuit cited evidence that had Antonio placed a manatee, the Sierra Club logo, and atoms, "all of which would have been non-responsive to the assignment to the extent that such topics were not specifically covered in class", Mrs. Weichert would not have folded over those images because no one "would surmise that [Weichert] may have been teaching religion in kindergarten." *Id.* Additionally, the Second Circuit, explained, there was evidence that had one of those images been on a student's poster, Weichert would have "asked the relevance of the picture to what he had learned in class" but that

17

"Antonio was never asked directly whether the robed figure bore any connection to the environment." *Id*. The Second Circuit found that one "possible interpretation" was that Mrs. Weichert and Principal Creme "viewed the Jesus image as being so wholly outside the scope of the curriculum that further inquiry was unnecessary before censoring the image, and that they would have also censored a secular image that was equally non-responsive." *Id*. Viewing the facts in the light most favorable to plaintiff, however, the Second Circuit held that it was also possible to infer that Weichert and Creme "were particularly disposed to censor Antonio's poster because of its religious imagery and that they would not necessarily have similarly censored secular images that were equally non-responsive." *Id*. If plaintiff proved these facts, the Second Circuit concluded, defendants' actions "might well amount to viewpoint discrimination." *Id*.

## IV.    CONCLUSIONS OF LAW

In accordance with the Second Circuit's decision in this matter, at trial, the Court and the parties proceeded on the premises that: (1) the School facilities were a non-public forum and that, accordingly, defendants were entitled to censor Antonio's poster in a reasonable and viewpoint-neutral manner, *Make the Rd. By Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004); and (2) the poster and the environmental program were school-sponsored and that the "*Hazelwood* 'reasonable relation to legitimate pedagogical concerns' test provides the appropriate lens through which to examine The District's censorship of Antonio's poster." *Peck*, 426 F.3d at 629. Further, based on the Second Circuit's decision in this case, the parties agree that the questions the Court must resolve following the bench trial are:

> Did plaintiff prove by a preponderance of the evidence that Antonio's poster conveyed a religious viewpoint on the topic of how to save the environment?

> Did plaintiff prove by a preponderance of the evidence that the poster would not have

been similarly treated if it had depicted a purely secular image that was equally outside the scope of Ms. Weichert's environmental lessons and non-responsive to the assignment?

Did plaintiff prove by a preponderance of the evidence that the direct cause of the decision to display plaintiff's second poster with the image of Jesus folded under was (a) an official policy of the Board of Education, or (b) a school district custom so permanent, widespread and well-settled as to constitute the equivalent of an official policy of the Board of Education of the Baldwinsville Central School District?

### A.       Viewpoint Discrimination

Viewpoint discrimination is a "subset or particular instance of the more general phenomenon of content discrimination," *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 831 (1995), in which "the government targets not subject matter, but particular views taken by speakers on a subject." *Id.* at 829. "[S]peech discussing otherwise permissible subjects cannot be excluded . . . on the ground that the subject is discussed from a religious viewpoint." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001); *accord Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993).

Assuming that Antonio's poster conveyed a religious viewpoint on the topic of how to save the environment, the Court concludes that plaintiff failed to prove by a preponderance of the evidence that defendants would have treated another poster with an equally non-responsive secular image, differently. As an initial matter, none of the images plaintiff relied on at trial are "equally non-responsive". Mrs. Weichert testified that she would permit an image that was not addressed in the environmental lessons if the student could explain how the image "related" to the environmental lessons, an opportunity she extended to every student, including Antonio. Each of the "secular images" plaintiff relied on directly "related" to the environment: the Sierra Club, as Mrs. Weichert pointed out, "has to do with environmental", T.61; atoms and a manatee are part of

19

the physical environment; and Smokey the Bear represents a campaign to prevent forest fires. The connection between the image of Jesus and the environmental lessons Mrs. Weichert taught, in contrast, and as Principal Creme testified, was "abstract," and required a "leap". T.123. Thus, none of the "secular images" are "equally non-responsive". The Court nonetheless considers whether Mrs. Weichert's and Principal Creme's responses to questions about these images offer insight into defendants' motivations for censoring Antonio's poster, and, more specifically, whether they show that defendants engaged in viewpoint discrimination.

At trial, plaintiff's counsel asked Mrs. Weichert and Principal Creme how they would have responded if, instead of an image of Jesus, a student had placed an image of a manatee, the Sierra Club logo, atoms, or Smokey the Bear on his poster. Mrs. Weichert responded that she would have allowed those images to be displayed if the student explained their relation to, or how they were consistent with, the environmental lessons. Although Mrs. Weichert stated during her deposition that she "probably" would have allowed an image of a manatee even if the student did not explain it, she further explained at trial that, unlike religion, which she did not talk about, she did talk about animals in class and "why we were taking care of the earth, to help the people as well as the animals."[5] T.56. Therefore, any comparison between Mrs. Weichert's responses to the presence of an image of a manatee and the image of Jesus, is inapposite.

In this case, it is undisputed that Antonio did not explain the image of Jesus on his poster, despite receiving the same opportunity any other student with a non-responsive image on his poster would have received. When Mrs. Weichert asked Antonio to explain his poster, he "talked about the little children throwing trash in the bucket". T.66-67. Antonio did not specifically talk

---

[5]Indeed, Antonio's poster as displayed contained pictures of four mice. There is no evidence that Antonio explained why they were there.

20

about the kneeling figure, so Mrs. Weichert "asked him just like I would anybody else if there were a portion that they didn't speak to, Antonio, there is another picture on this poster, would you like to talk about it, and Antonio didn't have anything to say about the other picture."  T.66. There is no evidence that Mrs. Weichert would have allowed the image of the Sierra Club logo, atoms, or Smokey the Bear without first receiving an explanation from the student about how that image related to the environmental lessons.  Thus, neither Mrs. Weichert's nor Principal Creme's responses to these questions reveal unconstitutional motivation since, unlike the hypotheticals which assumed the student explained how the image related to the environment, Antonio gave no explanation, even when prompted.

Plaintiff argues that it is of no consequence that Antonio did not explain how the image of Jesus related to the environment because defendants would have censored Antonio's poster on the basis that it was religious, regardless of his explanation.  In support of this argument, plaintiff points that although Mrs. Weichert testified that she would allow images of the Sierra Club logo, atoms, or Smokey the Bear to be displayed if the student had explained how the image was relevant to the environmental lesson, neither she nor Principal Creme could say whether they would have allowed the image of Jesus to be displayed if Antonio had related the image to the environmental lessons.  This, plaintiff argues, is evidence of viewpoint discrimination because it shows that defendants treated the image of Jesus differently because it was religious.

Mrs. Weichert testified that she could not answer the question of whether she would have allowed the image of Jesus to be displayed if Antonio had explained how the image related to the environmental lessons because: (1) Antonio offered no explanation; (2) she would "have to hear what Antonio had to say on the subject of why the kneeling figure was there" before she could

answer that question; and (3) she was "vague on how he could have possibly explained how he felt that he directly could take care of the earth - - I don't know."  T.87-88.  Principal Creme unequivocally testified that in his opinion, Antonio lacked the capacity to appreciate or explain the relationship between the image of Jesus and the environment and thus could not answer the question.  None of these reasons depend upon religion; they center on the fact that Antonio did not explain the image of Jesus, the abstractness of the relationship between religion and the environmental lessons, and Antonio's inability to appreciate or explain such a relationship.  Therefore, Mrs. Weichert's and Principal Creme's inability to say whether they would have accepted Antonio's poster with the image of Jesus if he had offered an explanation, is not evidence of viewpoint discrimination.

Unquestionably, the religious nature of the image of Jesus on Antonio's poster was of concern to both Mrs. Weichert and Principal Creme.  They repeatedly testified that they believed that parents at the environmental program who saw Antonio's poster might think that Mrs. Weichert was "teaching in the classroom that Jesus would be a way to save the earth or help the earth."  T.82.  While this concern obviously centers on the religious nature of the image of Jesus, it is not evidence of viewpoint discrimination.  As the Second Circuit stated in its discussion of plaintiff's Establishment Clause claim, "[w]hile the . . . avoidance of the perception of religious endorsement, is no doubt involved with religion, such a goal does not bespeak an intent to inhibit religion itself."  *Peck*, 426 F.3d at 634.  Indeed, as educators, Mrs. Weichert and Principal Creme, are obligated to "assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the

school." *Hazelwood*, 484 U.S. at 271.  Thus, "educators do not offend the First Amendment by

exercising editorial control over the style and content of student speech in school-sponsored

expressive activities so long as their actions are reasonably related to legitimate pedagogical

concerns." *Id*. at 273.

Further, Mrs. Weichert's and Principal Creme's legitimate pedagogical concern that

parents might think, based on Antonio's poster, that Mrs. Weichert was teaching religion, was

reasonable given the purpose and parameters of the assignment.  The poster assignment was

designed to "enhance the student's understanding of his environment" and to enable the teacher to

assess what the child had learned from the environmental lessons.  Plaintiff's Ex. 1.  Further, the

assignment  was limited to depicting "ways to save our environment, i.e. pictures of the earth,

water, recycling, trash, trees, etc." *Id*.  Mrs. Weichert instructed her students that the poster

should show what they had learned in class.  T.100.  Mrs. Weichert testified that an image would

be acceptable so long as the student could "relate" it to the environmental lessons.  Since the

intent of the poster assignment was to prompt the student to demonstrate what he had learned

from the environmental lesson, it was reasonable for the educators in this case to be concerned

that a parent viewing Antonio's poster might think he had learned about Jesus in class.  Although,

as Principal Creme testified, there were steps they could have taken to minimize this possibility

other than censoring Antonio's poster, "[t]he *Hazelwood* standard does not require that the

guidelines be the most reasonable or the only reasonable limitations, only that they be

reasonable." *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 932 (10th Cir. 2002)

(internal quotation marks omitted, alteration omitted ).  Thus, based on the above, the Court finds

that plaintiff failed to prove by a preponderance of the evidence that the poster would not have

been similarly treated if it had depicted a purely secular image that was equally outside the scope

23

of Mrs. Weichert's environmental lessons and non-responsive to the assignment.  Accordingly, in

the absence of viewpoint discrimination, plaintiff's free speech claim is dismissed.

### B.  *Monell*

Plaintiff continues to argue that defendants have waived the *Monell* issue because they did

not address it prior to trial.  The Court reaffirms its prior holding that:

> [t]here is no merit to plaintiff's argument that defendants waived this issue or should
> have raised it as an affirmative defense. The matters raised in the January 22, 2007
> letter do not excuse plaintiff from his burden at trial to establish that the alleged
> deprivation in issue resulted from an official policy or custom. Plaintiff's motion
> (Dkt. No. 107) is denied.

Dkt. No. 110, Memorandum-Decision and Order - Pretrial Issues, pp. January 24, 2007.  Further,

in the absence of any unconstitutional conduct, even assuming plaintiff established by a

preponderance of the evidence that the conduct at issue executed an official school district policy

or was conducted pursuant to school district custom so permanent, widespread and well-settled as

to constitute the equivalent of an official policy of the Board of Education, *see Monell v. New*

*York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), they would not be entitled to relief.

## V.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that **judgment is entered for defendants**; and it is further

**ORDERED** that the **complaint is dismissed**; and it is further

**ORDERED** that the Clerk of the Court is directed to **close this case**.

**IT IS SO ORDERED.**

Date:  September 30, 2008

Norman A. Mordue
Chief United States District Court Judge

24